UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES N. JACKSON,<br><br>    Plaintiff,<br><br>  v.<br><br>KIOLO KIJAKAZI,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | Case No. 20 C 4466<br><br>Magistrate Judge Sunil R. Harjani |

## MEMORANDUM OPINION AND ORDER

Plaintiff James J.[1] brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the Commissioner's decision denying his application for disability insurance benefits (DIB) and supplemental security income (SSI). The Commissioner moves for summary judgment [24] seeking affirmance of the decision denying benefits. For the reasons that follow, the ALJ's decision is affirmed, James's motion [21] is denied, and the Commissioner's summary judgment motion [24] is granted.

## BACKGROUND

James alleges disability due to post traumatic stress disorder, Wegener's Disease, a broken nose, a shoulder injury, anxiety, a foot injury, and sciatic nerve in both legs. (R. at 96). Some of James's chronic medical issues date back to a 2014 injury, however, some of his issues were exacerbated because of an altercation he was involved in on April 17, 2016. *Id.* at 354, 366, 690. On that date, James was attacked by a disgruntled co-worker at his job. *Id.* at 59, 478. James alleges that the co-worker grabbed him from behind, threw him over a desk, and kicked and

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

stomped on him. *Id*. at 478, 596, 1058, 1151. Prior to the April 17, 2016 incident, James worked as a sales manager at a mattress firm. *Id*. at 82. At his hearing, James testified that he developed post-traumatic stress disorder and is unable to be around other people in a work setting because of the 2016 altercation. *Id.* at 57-58. The medical records show that he has a myriad of health problems including renal vasculitis, PTSD, Henoch-Schoenlein Purpura, paranoia, back pain, leg pain, headache, urinary frequency, neck pain, and knee pain. *Id.* at 982, 1009, 1039, 1632. James's treatment for those conditions included primary care visits, pain specialist visits, orthopedic visits, physical therapy, spinal epidural injections, medical imaging, and prescription medications. *See, e.g.*, *id.* at 416, 427, 440, 567, 626, 628, 713, 723, 882, 995, 1058, 1081, 1085, 1146, 1149, 1624, 2051.

James initially filed for DIB and SSI on May 17, 2017, when he was forty-six years old, alleging an onset date of April 17, 2016. *Id.* at 95-96. His date last insured was December 31, 2018, at forty-nine years old. *Id at 95*. James's claims were initially denied on December 1, 2017, and upon reconsideration on August 30, 2018. *Id.* at 182, 187. Pursuant to James's request, he was granted a hearing and he appeared and testified at that hearing on June 17, 2019 before ALJ Janet Akers. *Id.* at 54-94. At the hearing, the ALJ heard testimony from James and a vocational expert, Elizabeth Gibson. *Id.*

On July 15, 2019, the ALJ issued an unfavorable decision denying James's claims. *Id.* at 16-44. Following the five-step sequential analysis, the ALJ found that James had not engaged in substantial gainful activity since the alleged onset date (step 1), and that he suffered from the severe impairments of granulomatosis with polyangiitis; IgA nephropathy; mild degenerative disc disease of the thoracic spine, degenerative joint disease of the lumbar spine; moderate osteoarthritis of the 1st MTP joint on the right hand; obesity; major depressive disorder; post-traumatic stress disorder;

and attention deficit hyperactivity disorder (step 2). *Id*. at 18-19. Subsequently, the ALJ determined that James's impairments did not meet or equal the severity of a listed impairment (step 3). *Id*. at 19.

Next, the ALJ concluded that James retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 20 CFR 416.967(a), with the following additional limitations:

> Remain at the workstation and no change in the work process; frequent climbing of ramps and stairs but no climbing of ladders, ropes or scaffolds; frequent balance, stoop, kneel, crouch and crawl; frequent handling and fingering bilaterally; avoid unprotected heights; occasional interaction with public incidental to the work being performed, working more with things rather than people; able to maintain attention and concentration in two hour blocks of time; respond appropriately to gradual and infrequently introduced changes in a routine work setting.

*Id.* at 23. As a result of the RFC finding, the ALJ determined that James was unable to perform his past relevant work as a building salesman, a self-employed fight promoter, or a sales manager/trainer (step 4). *Id.* at 41. However, the ALJ found that he had the RFC to perform the full range of sedentary work available in significant numbers in the national economy such as an assembler, an inspector, and a packer (step 5). *Id.* at 42. Finally, the ALJ determined that beginning on July 10, 2019, considering the approaching change in the claimant's age from 49 to 50, there were no jobs that exist in significant numbers in the national economy that James could perform, and he became disabled on that date. Id. at 43. The Appeals Council denied James's request for review on May 26, 2020, leaving the ALJ's decision as the final decision of the Commissioner. *Id*. at 1-5; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

**DISCUSSION**

Under the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 (7th Cir. 1985). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is "more than a mere scintilla" and mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). Furthermore, "whatever the meaning of 'substantial' in other contexts," the Supreme Court has emphasized, "the threshold for such evidentiary sufficiency is not high." *Id.* In reviewing an ALJ's decision, the Court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment

for that of the" ALJ's. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The Court reviews the ALJ's decision deferentially and will affirm if substantial evidence supports the decision. *See* 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1154; *Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *5 (7th Cir. Aug. 27, 2021). Nonetheless, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

James raises three main arguments in support of his request for reversal: (1) that the ALJ's finding of disability beginning on July 10, 2019 is arbitrary; (2) that the ALJ erred by failing to find that a listing level severity was either met or equaled at Step 3; and (3) that the ALJ failed to properly accommodate all of his limitations in the RFC assessment. The Court affirms the ALJ's decision because her findings are supported by more than a mere scintilla of evidence, the Court can follow the ALJ's analysis in conducting a meaningful review, and a reasonable mind could accept the conclusion reached. This Court cannot and does not reweigh the evidence or substitute its own judgment for that of the ALJ's. Accordingly, for the reasons stated below, remand is not appropriate.

### A.      Medical Vocational Grid

James's first argument is unavailing. He challenges the ALJ's finding of disability beginning on July 10, 2019. Doc. [21] at 9. Specifically, James argues that the July 2019 date has no relevance to his medical condition and has little to do with the Medical Vocational Grid Rules.[2] James presents this argument with no basis in the case law. When a claimant is within a few days

---

[2] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Anderson v. Astrue*, No. 09 C 2399, 2011 WL 2416265, at *10 (N.D. Ill. June 13, 2011) (explaining that the grids are a series of tables and rules which incorporate the principal vocational elements of age, education, and skill level from past relevant work to direct an outcome of "disabled" or "not disabled" based on these factors and the claimant's RFC. The age categories are younger (18–49); closely approaching advanced age (50–54); and advanced age (55 or older)).

to a few months of reaching a higher age category and the higher category would result in a determination that the claimant is disabled, the Administration states that it "will consider whether to use the older age category after evaluating the overall impact of all the factors" of a claimant's case, and that it will not apply the categories mechanically. 20 C.F.R. § 404.1563(b). Therefore, while § 404.1563(b) prevents the Commissioner from mechanically applying the age categories, it does not provide further guidance about how it is to be applied and what is required of an ALJ to show that they did not "mechanically apply" the age categories. *See Moody v. Berryhill*, 245 F. Supp. 3d 1028, 1033 (C.D. Ill. 2017). Moreover, "[t]here is a divergence of opinion within the circuits on the issue of whether an ALJ must explicitly show" that she considered the borderline age issue. *Anderson*, 2011 WL 2416265, at *14. The Seventh Circuit has not expressly addressed the issue, however, in this district, courts have held that the absence of a "statement by the ALJ from which it can be determined that she even considered which category was the appropriate one in which to place the plaintiff ... alone requires remand," as such an absence makes it "impossible for there to be meaningful review of the age category determination. *Figueroa v. Astrue*, 848 F. Supp. 2d 894, 899-900 (N.D. Ill, 2012) *See also Cisero v. Colvin*, No. 14 C 8419, 2016 WL 3568082, at *3 (N.D. Ill. June 24, 2016); *Pelech v. Colvin*, No. 14 C 7021, 2016 WL 727208, at *7 (N.D. Ill. Feb. 22, 2016). Furthermore, the regulations give the ALJ discretion to be "generous or exacting" when contemplating a borderline age situation. 20 C.F.R. § 404.1563(b); *see also McKay v. Colvin*, No. 15 C 9522, 2016 WL 6432582, at *5 (N.D. Ill. Oct. 31, 2016); *Figueroa*, 848 F. Supp. 2d at 896.

Here, James was classified as an individual of younger age on his onset disability date, at age forty-six, and through his date last insured, at age forty-nine. *See Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989) (finding that a forty-nine-year-old claimant was properly categorized as

a "younger individual."). Nonetheless, at the time of the ALJ's decision, James was within six months of qualifying for the next higher age category. (R. at 41). As a result, the ALJ explicitly noted that a borderline age situation existed and determined that James's disability start date was July 10, 2019.[3] The ALJ explained that based on James's "combined symptoms from his physical and mental health impairments, the record did not suggest that the claimant would have improvement to indicate any less restrictive residual functional capacity by the time the claimant turns 50." *Id.* Therefore, the ALJ determined "that based upon the limited time until James's fiftieth birthday, and the multiple work restrictions from his impairments, that nonmechanical application of the claimant's age category was appropriate." *Id.* Furthermore, the ALJ assessed that prior to James's change in age, he could perform unskilled sedentary work pursuant to Grid Table 1 Rule 201.21. *Id.* at 42. The ALJ also noted that James has a high school degree and that his former job skills were not transferable. *Id.* Next, the ALJ explained that pursuant to Grid Table 1 Rule 201.14—which shows that a person closely approaching advanced age with a high school degree and no transferable skills should be classified as disabled—James's disability began on July 10, 2019. *Id.* at 43.

Therefore, the ALJ sufficiently considered the borderline age issue and determined that when James became a person closely approaching advanced age, considering his age, education and RFC, he was classified as disabled. James, however, does not argue that the ALJ failed to articulate his consideration of the borderline age situation; instead, he claims that the ALJ's

---

[3] James's 50th birthday was on August 15, 2019. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2(g) (providing that an individual approaching advanced age between ages of 50 and 54 is disabled if limited to sedentary work, has education that does not provide for direct entry into skilled work, and has no transferable skills from previous work experience).

decision to choose July 10, 2019, as the start of his disability was a "mystery."[4] *See* Doc. [21] at 9. James provides this Court no case law to support his position. This is not surprising because the law states that the ALJ has the discretion to be generous or exacting when contemplating and determining the specifics of a borderline age situation. 20 C.F.R. § 404.1563(b). Indeed, all that is required by the ALJ is that she consider the borderline age situation and explain her analysis. As discussed above, the ALJ, here, considered the age category determination, supported the conclusion with substantial evidence, minimally articulated her reasoning, and in her discretion selected July 10, 2019 as the date for the start of disability, which was approximately one month before James's fiftieth birthday. Nothing more was required. Accordingly, there is no error.

**B.     Step 3**

Next, James argues that the ALJ erred by failing to find that his impairments met or equaled Listing 14.03B.[5] James presents one main point here. He asserts that the ALJ's finding that James has a less than marked limitation in maintaining social functioning and in concentration, persistence, and maintaining pace are unsupported. Doc [21] at 9-11. To establish a listing level

---

[4] James raises a similar argument in section B, contending that the ALJ's July 10, 2019, determination is arbitrary and that her decision was an acknowledgement that James's mental impairments met or equaled the listing level severity from the onset date. *See* Doc. [21] at 11. To the contrary, as discussed here, the ALJ found plaintiff disabled on July 10, 2019 because she recognized that a borderline age situation existed and found that a non-mechanical application of plaintiff's age category was appropriate. She did not, as James suggests, find him disabled on July 10, 2019, because his impairments met or equaled the criteria of a listed impairment.

[5] James makes an additional meritless argument here. James states that the ALJ should have, at the very least, found medical equivalence pursuant to listings 14.03B and 12.15. For the reasons stated in this section, the ALJ sufficiently justified her Step 3 determinations. *See also* Social Security Ruling (SSR) 17-2p (stating that "if an adjudicator at the hearings . . . believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding.)

8

severity pursuant Listing 14.03B, an individual must establish repeated manifestations of systemic vasculitis with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss), and marked limitation in one of the following: activities of daily living; maintaining social functioning; or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. In the present case, the ALJ found that James's mental status exam findings were inconsistent with a marked limitation in social functioning and concentrating, persisting, or maintaining pace.[6] (R. at 20-22). Instead, the ALJ determined that no more than moderate limitations were supported by the evidence. *Id.* at 20-22. In her analysis, the ALJ considered James's visits to Aunt Martha's Health and Wellness where his mental status exams indicated that he was friendly, cooperative, calm, alert, appropriate, and with normal moods. *See Id.* at 22, 1999, 2002, 2005, 2008, 2011, 2014. The ALJ also noted that James consistently presented well, appearing pleasant and comfortable to his visits with Dr. Said. *Id.* at 21, 2080, 2086, 2092, 2099, 2134. The ALJ also considered James's numerous complaints to his primary care of feeling a sense of great danger, anxiety, having thoughts of violence, and having frightening visions or sounds. *Id.* at 20, 512, 564, 1635. Nevertheless, the ALJ also evaluated the numerous times when James denied any mental disturbances at his primary care visits. *Id.* at 481, 488, 497, 503, 1642.

Furthermore, the ALJ considered the instances when James's primary care indicated that his mood was well-adjusted, pleasant, and cooperative. *Id.* at 22, 1081, 1085. The ALJ also noted James's nephrology visits where he presented with appropriate effect and was alert and oriented.

---

[6] The ALJ analyzed the 14.03B functional limitations together with the mental impairments functional "B criteria," because they parallel each other. *See* (R. at 20). If a claimant "has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional limitation in four broad areas," which include: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008) (citing 20 C.F.R. § 404.1520a(c)(3)).

*Id.* at 22, 650, 659, 675, 2281, 2290. The ALJ then noted an outburst that James had during his check-in at a psychological consultative exam with Amy L. Horrex. *Id.* at 22, 1592. However, the ALJ also noted that James was cooperative and answered all questions during his evaluation, and that the overall record did not support persistent unusual behavior.[7] *Id.* Finally, the ALJ acknowledged that her findings differed from the state agency psychological consultant opinions of a marked limitation in the area of interacting and relating to others. *Id.* at 22. The ALJ explained that she declined to follow the consultants' finding because they did not have the opportunity to review the later psychiatric treatment records that support normal mental status exam findings and normal presentations. *Id.*

Moreover, regarding concentrating, persisting, or maintaining pace, the ALJ considered James's ability to manage his finances and his ability to drive. *Id.* at 22. The ALJ also noted mental and psychiatric exams that found James had normal attention span, concentration, and a normal neurological examination that included a successful word recall test. *Id.* at 22, 482, 489, 497, 513, 1904, 1918, 2102. Thus, the ALJ sufficiently articulated her assessment of Listing 14.03B. While James suggests the ALJ allegedly failed to consider certain parts of the record, he effectively asks the Court to reweigh the evidence. As stated earlier, the ALJ need not mention every piece of evidence in the record, and the Court cannot reweigh the evidence. *Burmester,* 920 F.3d at 510. Therefore, the ALJ supported her analysis with evidence that was more than a mere scintilla.

C.     RFC

Lastly, James contends that the ALJ failed to accommodate his combined limitations in her RFC assessment. The ALJ need only "minimally articulate" her reasoning so as to build an

---

[7] James also argues that he has a propensity to "snap," and that there is every reason to believe he would be triggered far too often in a workplace setting to sustain the requisite socially appropriate behavior. *See* Doc. [21] at 11. However, James presents no evidence of this in the record, and the ALJ considered plaintiff's one noted outburst at the consultative examination.

accurate and logical bridge from the evidence to her conclusions. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Here, the ALJ properly considered James's medical limitations when she reduced his RFC to sedentary work.[8] To begin, the ALJ considered James's joint pain, his fatigue, (related to his granulomatosis with polyangiitis/vasculitis, IgA nephropathy, degenerative disc disease of the lumbar and thoracic spine, and moderate osteoarthritis of 1st MTP joint), and his obesity. (R. at 40). Specifically, the ALJ referenced James's rheumatology treatment notes that reflected a good response to medications, his flare-ups requiring hospitalizations, and his complaints of pain, tenderness, and swelling. *Id.* Furthermore, the ALJ found that while James's mental status exams did not indicate an in inability to interact with the public, her assessment accounted for his social limitations by requiring that he work more with objects than with people. *Id.* at 39. Subsequently, the ALJ explained that due to James's moderate limitations in concentration and focus, she determined that he could maintain attention and concentration in two-hour blocks of time. *Id.* Next, the ALJ stated that due to James's moderate limitations in adaptation or managing oneself, she found that he could respond appropriately to gradual and infrequently introduced changes in a routine work setting. *Id.* Further, the ALJ explained that her determination of frequent handling and fingering bilaterally was based on her evaluation of James's exams that note pain and swelling in his hands, but also his neurological and physical consultative exams showing normal hand strength. *Id.* at 40. Finally, she determined that, due to James's medication side effects and fatigue, he should not climb ladders, ropes or scaffolds, and should avoid unprotected heights. *Id.*

In addition, the ALJ also considered and recounted James's subjective symptoms, medical visits, consultative examination reports, and the state agency assessments at length. *See Id.* at 24-

---

[8] The non-examining state agency physical medical consultants found that James could sustain work-related activity at the light and less than light exertional level. (R. at 39-40).

11

40. Still, James contends that the ALJ failed to consider parts of the record. First, he claims that the ALJ did not mention his edema and pain. Doc. [21] at 13. The ALJ, however, did note those symptoms. For example, the ALJ referenced James's swelling of his upper extremities, and his bilateral knee, wrist, and elbow pain. (R. at 30). Second, the ALJ specifically mentioned a February 19, 2018 visit that James alleges the ALJ ignored. The ALJ noted that James complained of fatigue, all over pain, bilateral tenderness in his knees, shoulders, wrists, and hands at his February 19, 2018 visit with Dr. Said. *Id.* Third, James accuses the ALJ of ignoring other documented symptoms associated with his vasculitis, like his December 11, 2017 and February 1, 2018 hospital visits. Doc. [21] at 14. To the contrary, the ALJ specifically referenced those and other hospital visits. The ALJ noted that in February of 2018, James was hospitalized twice and had two blood transfusions. (R. at 23-24). Furthermore, the ALJ noted that on December 11, 2017, the claimant presented to the emergency room with chest pain and increased swelling. *Id.* at 33.

Finally, James claims that the ALJ did not sufficiently consider his headaches in her RFC findings. Doc. [21] at 14-15. Yet, the ALJ noted James's headaches a handful of times in her analysis. (R. at 19, 24, 25, 31). Although it may have been in a different section of the ALJ's decision, the Seventh Circuit has noted that "it is proper to read the ALJ's decision as a whole." *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five."); *Jeske v. Saul*, 955 F.3d 583, 590 (7th Cir. 2020) ("[t]he five-step evaluation process comprises sequential determinations that can involve overlapping reasoning. This is certainly true of step three and the RFC determination that takes place between steps three and four[.]"). The ALJ also specifically mentioned James's September 19, 2018, evaluation for migraine headaches at Channahon Healthcare Center where he was advised to get a sleep study, however, that study was never

completed. *Id.* at 2111. Additionally, the ALJ referenced his 2019 treatment notes from Channahon Healthcare Center that reflect a denial of headache pain. *Id.* at 19, 2080, 2085, 2090. Finally, James does not point the Court to any part of the record indicating that his headaches require any additional functional limitations not already accommodated for by the ALJ's RFC finding. *See Weaver v. Berryhill*, 746 F. App'x 574, 579 (7thCir. 2018) ("It was [plaintiff's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work."). Even so, the ALJ acknowledged, considered, confronted, and weighed the evidence for and against a finding of disability, and she supported her RFC finding with substantial evidence.

## CONCLUSION

Ultimately, in this case, the ALJ minimally articulated her reasoning, supported her decision with more than a mere scintilla of evidence, and a reasonable mind could accept the conclusion. The Court cannot and will not reweigh the evidence, and as discussed above, the ALJ built a sufficient logical bridge between the record and her conclusions. For the reasons set forth above, the Commissioner's motion [24] is granted, and the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: January 26, 2022

Sunil R. Harjani
United States Magistrate Judge